Case 2:22-cr-00347-JMA-SIL    Document 40    Filed 09/27/23    Page 1 of 13 PageID #: 143



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NB:AXB
F. #2021R00267

*610 Federal Plaza*
*Central Islip, New York 11722*

September 27, 2023

<u>By ECF</u>

The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Dennis Wolfolk
              <u>Criminal Docket No. 22-347 (JMA)</u>

Dear Judge Azrack:

      The government respectfully submits this letter in connection with the sentencing of defendant Dennis Wolfolk in the above-captioned matter. As set forth in the Presentence Investigation Report ("PSR"), Wolfolk faces a statutory maximum penalty of 180 months' imprisonment and advisory Guidelines of 57 to 71 months. (PSR ¶¶ 1 n.1, 74). For the reasons that follow, the government submits that a Guidelines sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

    I.   <u>Factual Background</u>

        A.  <u>Overview of the Scheme</u>

      On or about December 22, 2022, Nassau County Homicide Detectives located a serialized gun box at the scene of a murder in Hempstead, New York. (PSR ¶ 2.) The serial number corresponded to a Glock .40-caliber handgun that was purchased on November 4, 2020 at a pawn shop in Douglasville, Georgia. (<u>Id</u>.) Paperwork completed at the time of that transaction revealed that Patrick Polidore, a Georgia resident, had purchased the weapon. (<u>Id</u>.) In fact, in a mere two-month period between October and December 2020, Polidore purchased approximately 29 handguns at various retail establishments in the Atlanta metropolitan area. (<u>Id</u>. ¶¶ 3-4.) Investigators studying those transactions determined that many of the firearms had been purchased in rapid succession, from multiple federally licensed firearm retailers, on a handful of common dates. For example, on October 29, 2020, Polidore purchased two handguns from two different retailers; six days later, on November 4, 2020, he purchased six more handguns, including the .40-caliber Glock that matched the gun box recovered at the Hempstead murder, from four different retailers; on November 18, 2020, he purchased five firearms from four different retailers; between November 20, 2020 and November 23, he purchased 10 handguns from at least four different

retailers; on November 30, 2020, he purchased two handguns from two different retailers; and two days later, on December 2, 2020, he purchased three more handguns from two different retailers.

On ATF Forms 4473—federal records that document firearms transactions—Polidore falsely affirmed that he was the actual purchaser of each of those weapons. In actuality, however, the firearms were intended for Wolfolk—who, as a convicted felon, was legally prohibited from possessing a firearm—to traffic the handguns to New York, where they were distributed to street-level buyers. (PSR ¶¶ 2-3.) Details of this scheme are outlined below:

B. <u>Offense Conduct</u>[1]

1. <u>Activities of October 29-30, 2020</u>

On October 25, 2020, cellular location data associated with Wolfolk's cellphone reflected that Wolfolk was physically present in Georgia. On October 28, 2020, Wolfolk texted with a prospective customer, who asked what two firearms the buyer could obtain with $1,000 ("lmk what two I cud get wit a band"). Wolfolk responded, in part, with several options, telling the buyer "G2c 9mm or Ruger 380" and "[a]nything in the Taurus, or maybe even Smith& W family." The buyer responded that s/he "need[ed] Taurus and Ruger." Consistent with these texts, the following day, cell-site data reflected Wolfolk's travel to the vicinity of Main Street Guns, Gold and Pawn in Hiram, Georgia, where Polidore purchased a Taurus 9mm model G2C handgun. Cell-site data also reflected Wolfolk's travel to Academy Sports + Outdoors in Kennesaw, Georgia, where Polidore purchased a .40-caliber Ruger model SR40C handgun. In other words, Polidore purchased a Taurus and a Ruger, just as Wolfolk's buyer requested. Later that evening, the same buyer texted Wolfolk to "[s]end pics bro." Wolfolk responded with the following images:



---

[1] Copies of evidence discussed in this section can be made available to the Court upon request.

Wolfolk also stated "$700-9" and "900-40," referring to the price of the 9mm and .40-caliber firearms, respectively. He added that he procured "[s]tandard & extended magz [magazines] for both."

The next day, on October 30, 2020, cell-site data reflected Wolfolk's travel from Georgia to Long Island, where his cellphone communicated with cell towers in the vicinity of Hempstead. Approximately 42 days later, on December 11, 2020, the Taurus 9mm model G2C handgun purchased by Polidore was recovered by police executing a traffic stop in Hempstead.

    2. <u>Activities of November 3-6, 2020</u>

On November 3, 2020—just four days after he returned to Long Island—Wolfolk texted Polidore that he "might shoot back down there." Wolfolk explained that the money he made re-selling the firearms had been depleted by his travel expenses ("What I flipped komin up damn near gone between hotel , cabs & food.") He indicated that he was returning with additional gun orders from New York ("the homies just gave me some bread to grab 4 jawns"). Beginning that same day, cell-site data reflected Wolfolk's travel from Long Island to Georgia, where he arrived on November 4, 2020.

On November 4, 2020, Polidore purchased a total of six guns from retailers in Douglasville, Hiram, and Kennesaw, Georgia. Not only did cell-site data place Wolfolk in the vicinity of each of those establishments, but text message communications also made clear that he was directing Polidore's activities inside the stores. Indeed, in a series of text messages, Wolfolk stated:

| | |
|---|---|
| 3:25:24 PM | Ask if u can purchase more than one at a time |
| 3:43:27 PM | I need this 380 right here |
| 3:43:41 PM | For 425 I gave u 3 already I got another 150 right here |
| 3:55:24 PM | Bro please try & get that for me |

The following day, cell-site data reflected Wolfolk's return to Long Island. And shortly after that, the guns Polidore purchased on November 4, 2020, began emerging in the possession of others. As noted above, on December 22, 2020, a serialized gun box matching a .40-caliber Glock model 27 handgun was recovered from the scene of a murder in Hempstead. On January 13, 2021, during a traffic stop in Hempstead, three juveniles were found in possession of a 9mm Ruger model Security-9 handgun. And on May 28, 2021, during a traffic stop in Patchogue, police arrested an individual in possession of a .22-caliber Walther model P22 handgun.

Electronic communications reflect the transaction by which Wolfolk illegally sold another of the firearms purchased by Polidore on that date. In a series of text messages on the afternoon of November 4, 2020, a prospective buyer confirmed the price of a .40-caliber firearm with a laser sight and high-capacity magazine ("40 . . . How much more you need for the attachments . . . Beam & stick?"). The buyer confirmed that he would send Wolfolk $750 via CashApp, the mobile payment platform. Wolfolk responded that he could "[d]ef grab u something for that" and provided the CashApp handle $MenaceKartel, the profile for which bears his true

3

name and likeness. Later that afternoon, Wolfolk texted the buyer, "Got u S&W two tone black & silver," and then sent the following image:



In fact, records reflect that on November 4, 2020, Polidore purchased a .40-caliber Smith & Wesson model M&P Shield from Academy Sports + Outdoors in Hiram, Georgia. Less than a month later, on October 3, 2021, this weapon was recovered from a fleeing robbery suspect in Bethpage.

3. Activities of November 16-18, 2020

On November 16, 2020, Wolfolk texted Polidore an apparent shopping list of gun orders with the message "[t]his the new order if I can make it happen":



As the Court can readily discern, Wolfolk had arranged for the purchase of at least 13 firearms and accessories. Wolfolk also explained that, because he had to return his rental car by Thursday, November 19, 2020, he had to travel to Georgia on Tuesday, November 17 ("if we

4

leave tmm morning we gonna get there Tuesday nite"), purchase as many firearms as they could on Wednesday, November 18 ("[s]hop Wednesday") and return to Long Island on Thursday, November 19 ("leave Thursday").

Consistent with that plan, cell-site data reflected Wolfolk's travel from New York to Georgia on November 17, 2020. The following day, Polidore purchased five firearms from multiple retailers in Hiram, Kennesaw, and Dallas, Georgia. Once again, cell-site data not only reflected Wolfolk's presence in the vicinity of those establishments, but text message communications also revealed that he directed Polidore's activities: "Ammo for 380 & see if they have 45 Winchester shells . . . See if that keltec for 2 somethin a 380 or 22."[2] Thereafter, as planned, cell-site data reflected that Wolfolk returned to Long Island on November 19, 2020.

Just five days later, on November 24, 2020, a Taurus 9mm model G2V handgun purchased by Polidore was recovered by police in Hempstead. And on February 12, 2021, a .38-caliber Charter Arms model Undercover handgun purchased by Polidore was recovered during a traffic stop in Brooklyn.

4. Activities of November 20 – 24, 2020

One day after returning to Long Island, Wolfolk texted Polidore that he was on his way back. Cell-site data reflected that, in fact, Wolfolk returned to Georgia on November 20, 2020. That day, Polidore purchased a .38-caliber Charter Arms model Undercover handgun from Kennesaw Mountain Pawn in Marietta, Georgia. The next day, Wolfolk texted Polidore, "We going shopping tomorrow" to "[g]rab some jawns to take back." On November 22, 2020, Polidore purchased three more firearms from Academy Sports + Outdoors locations in Kennesaw and Hiram, Georgia. Cell-site data confirmed that Wolfolk was again in the vicinity of those stores and electronic communications showed that he again directed Polidore's activities ("Get the spectrum & the m&p").[3] The next day, on November 23, 2020, Polidore purchased another five firearms from Academy Sports + Outdoors locations in Kennesaw and Hiram, Georgia. And on November 24, 2020, cell-site data reflected Wolfolk's return to Long Island.

Approximately 49 days later, on January 12, 2021, a Taurus 9mm model G3C handgun purchased by Polidore on November 23, 2020, was recovered from a parolee in Lynbrook. And on March 10, 2021, a Glock 9mm model 19 handgun was recovered by police in Hempstead.

5. Activities of November 28 to December 4, 2020

On November 28, 2020, Wolfolk texted Polidore that he would be back in Georgia the following afternoon. He also stated that he had purchased $1,000 worth of counterfeit bills for $350 ("I got a band in counties . . . could be risky . . . the band was for 350"), which Polidore

---

[2] Wolfolk's reference to a "keltec" matches one of the firearms purchased by Polidore that day, namely, a 9mm Keltec CNC Industries model PF-9 handgun.

[3] For his part, Polidore likewise kept Wolfolk apprised of his activities, telling him that the employees were "taking 2 long wit the paper wrk" and "I'm bout to go pay for them now."

5

indicated would pay for itself with the proceeds of one re-sold firearm ("That's 1 grip flipped"). Cell-site data reflected Wolfolk's travel from New York to Georgia on November 29, 2020, and on November 30, 2020, Polidore purchased two firearms from retailers in Kennesaw and Marietta, Georgia. Two days later, on December 2, 2020, Polidore purchased another two firearms from Southside Gold, Gun and Pawn in Dallas, Georgia. As before, cell-site data placed Wolfolk in the vicinity of those establishments and his text messages with Polidore reflected their coordination:

| | | |
|---|---|---|
| Polidore: | | 2 450 |
| | | They got the grey n Blk 40 |
| Wolfolk: | | Like the 9? The SDV40? |
| | | Just make sure it's the 40 bc all sales are final |
| | | G43 |
| | | & 2 subcompact 40s |
| | | [. . .] |
| | | XD 40? |
| | | XX? |
| Polidore: | | Yah |
| Wolfolk: | | How much they want for it? |
| Polidore: | | 399 |
| Wolfolk: | | 400 for the XD 40 yeah grab that & the g43 |

Consistent with Wolfolk's instruction to "grab" the "XD 40" and "the g43," on December 2, 2020, Polidore did, in fact, purchase a Glock 9mm model 43 handgun and a .40-caliber Springfield model XD40 handgun.

Two days later, on December 4, 2020, Polidore also purchased a 9mm KAHR Arms model CM9 handgun from AAA Pawn Brokers, Inc., in Marietta, Georgia. Shortly after that purchase, the car in which Polidore and Wolfolk were traveling—which had evidently been reported stolen out of Hempstead—was stopped by officers with the Marietta Police Department. (PSR ¶ 30.) A search of the vehicle resulted in the seizure of two bags containing 13.2 grams of marijuana, a digital scale with marijuana residue, $960 in cash (which Wolfolk reportedly admitted to police was proceeds of marijuana dealing), and two firearms: (i) the KAHR Arms handgun Polidore purchased earlier that day; and (ii) a Taurus 9mm handgun with a mounted laser sight. (Id.)

Although the PSR notes that the defendant was arrested and detained in connection with that incident, investigators have obtained text messages that Wolfolk exchanged with a prospective gun buyer on the same date. In those messages, Wolfolk explained that "[t]he load is gone" and that someone had tried to extort him by reporting stolen the vehicle he was driving. Wolfolk also stated that his fingerprints were in the car and on the firearms themselves ("My prints & everything in the car & the hammers) but that the guns had been purchased by Polidore in his own name ("they all in my mans name too").

C. <u>Evidence of Uncharged Activities</u>

In addition to the specific transactions outlined above, investigators have uncovered substantial evidence of a broader gun-trafficking operation helmed by Wolfolk. In that regard, on November 17, 2020, Wolfolk straightforwardly told a prospective buyer, "I sell hammers . . . that's what I make my trips for." When the buyer responded "Ok I need one," Wolfolk replied "I can get whatever u want" and provided videos depicting numerous firearms and accessories, some of which he claimed formed "the last order I jus brung up." Still images derived from those videos appear below:







7



In encrypted WhatsApp messages, Wolfolk also described the details of his business model, explaining that prospective customers had the option to "invest" with him by advancing money to help cover the upfront cost of large gun orders, which the customer would make back, with profit, when the weapons were re-sold. To illustrate, Wolfolk sent one potential "investor" a screenshot of a separate conversation in which a prospective buyer requested seven guns that Wolfolk estimated would cost approximately $2,000 to purchase but for which he would charge $5,000. "My only issue is I don't have the money to cover his 7," he explained, "[t]hat's why im possibly looking for somebody to invest . . . At minimum to purchase no less than 2 bands . . . But u making 3 bands" in profit.

D. The Federal Proceedings

On or about July 28, 2022, a grand jury in the Eastern District of New York returned an 11-count indictment charging Wolfolk and Polidore with one count of conspiring to illegally deal in firearms, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A), and one count of conspiring to make false statements to acquire firearms, in violation of 18 U.S.C. §§ 371 and 922(a)(6). The grand jury also indicted Polidore on nine counts of making false statements to acquire firearms, in violation of 18 U.S.C. § 922(a)(6), and Wolfolk for being a felon in possession, in violation of 18 U.S.C. § 922(g)(1). (ECF:1.)

On May 3, 2023, Wolfolk appeared before United States Magistrate Judge Steven I. Locke and pled guilty to being a felon in possession of a firearm at the time of his arrest on December 4, 2020. (PSR ¶ 1; ECF:30.) On June 7, 2023, this Court adopted Magistrate Judge Locke's recommendation and accepted Wolfolk's guilty plea. (ECF:33.)

8

II.  Guidelines Calculation

The Guidelines calculation, as set forth in the PSR, is as follows:

| | |
|---|---:|
| Base Offense Level (§§ 2K2.1(a)(4)(6)) | 14 |
| Plus:  Involved Between 25 and 99 Firearms (§ 2K2.1(b)(1)(C)) | +6 |
| Plus:  Involved Firearms Trafficking (§ 2K2.1(b)(6)(B)) | +4 |
| Less:  Acceptance of Responsibility (§ 3E1.1(a), (b)) | -3 |
| Total: | 21 |

(PSR ¶¶ 11-21.)

Based upon a total offense level of 21 and Criminal History Category IV, Wolfolk's advisory Guidelines range is 57 to 71 months' imprisonment.  (PSR ¶ 74.)

III.  Argument

For the reasons that follow, the government respectfully submits that a Guidelines sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

A.  Seriousness of the Offense

Initially, the Guidelines accurately reflect the seriousness of the defendant's conduct in trafficking more than two dozen firearms into the community.  See 18 U.S.C. § 3553(a)(2)(A).  Gun trafficking is always a serious offense.  See, e.g., United States McCann, No. 23-CR-08 (WFK), 2023 WL 2857917, at *3, *4 (E.D.N.Y. Apr. 10, 2023) (finding, in the context of a detention hearing, that charges relating to "a firearms trafficking conspiracy alleged to have distributed over 50 guns throughout Brooklyn" was "inherently dangerous," and endorsing Magistrate Judge's observation that "dealing guns in a highly-populated area" "exhibited a disregard for the danger of the community"); United States v. Ruffin, No. 16-CR-729, 2020 WL 3547772, at *3 (S.D.N.Y. June 30, 2020) (recognizing, in the context of denying a compassionate release motion, that "firearms trafficking is serious and dangerous conduct" based on which "the Court cannot find that [the defendant] present[ed] no danger to the community"); United States v. Hakime, No. 22-CR-699 (AT), 2023 U.S. Dist. LEXIS 6919, at *8 (S.D.N.Y. Jan. 13, 2019) (finding, in the context of a detention hearing, that "'[g]un trafficking and the possession of a firearm by a felon, by their nature, pose a substantial risk to the community'" and that "'[t]he clandestine sale of . . . weapons by an unlicensed, convicted felon to another who also could have been a felon intent on criminal activity poses a significant danger' to the community") (quoting United States v. Campbell, 28 F. Supp. 2d 805, 809 (W.D.N.Y. 1998)).  The fact that that several of the trafficked firearms in this case were found in the hands of juveniles, a parolee, and suspects in other crimes speaks to the unusually brazen and indiscriminate nature of Wolfolk's distribution activities.  The harm his conduct posed to the community is self-evident.

9

B. Afford Adequate Deterrence

In fashioning an appropriate sentence, the Court must also consider the need to afford adequate deterrence to criminal conduct. See 18 U.S.C. § 3553(a)(2)(B). This includes general deterrence, which "justifies sentences in the name of discouraging the general public from recourse to crime," and specific deterrence, which "defends criminal penalties as a way to dissuade individual offenders from repeating the same or other criminal acts." United States v. Parilla, No. 12-CR-140 (VLB), 2021 WL 1399686, at *5 (D. Conn. Apr. 14, 2021).

1. General Deterrence

First, as for the need to achieve general deterrence, it is well-documented that New York's strict gun laws make it a profitable destination for illegally trafficked firearms along the so-called "Iron Pipeline"—the corridor along I-95 that is used to transport firearms purchased in states like Pennsylvania, Virginia, North Carolina, South Carolina, Georgia, and Florida, to New York. See Office of the New York State Attorney General, Target on Trafficking: New York Crime Gun Analysis (hereinafter, "NYAG Report"), available at https://targettrafficking.ag.ny.gov/ (last accessed Sept. 25, 2023). According to statistics maintained by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), almost 90% of all firearms recovered in New York between January 1, 2021, and December 31, 2021, originated in other states. See ATF Firearms Trace Data: New York – 2021, available at https://www.atf.gov/resource-center/firearms-trace-data-new-york-2021#source-states (last accessed Sept. 25, 2023). Of those, nearly 10% originated in Georgia, making it the largest out-of-state source of illegal guns. See id. This is no coincidence: the Office of the New York Attorney General has concluded that "the weakness of the gun laws in the Iron Pipeline states," including Georgia, "combined with direct access to New York via interstate highways and public transportation, has made them become the source-of-choice among gun traffickers running guns into New York." See NYG Report; accord Gary Kleck, BATF Gun Trace Data and the Role of Organized Gun Trafficking in Supplying Guns to Criminals, 18 ST. LOUIS UNIV. PUB L. REV. 23, 41 (1999) (identifying New York as an "unusual area[ ] . . . where the supply of legally owned guns and stolen guns circulating among criminals is low enough to leave room for criminal entrepreneurs to make a living selling guns illegally," as "[o]nly in areas where it was hard for a criminal to obtain guns legally via their own purchase, by theft, or by purchase of a stolen gun would there be significant numbers of customers willing to pay prices substantially over retail.").

To disincentivize the importation of (and thereby stem the tide of) illegal guns, it has been held that that sentences for gun traffickers in this district should reflect that such conduct undermines New York's deliberate firearm regulatory regime, thereby creating the lucrative secondary market that Wolfolk exploited in this case. See United States v. Cavera, 550 F.3d 180 (2d Cir. 2008) (en banc) (affirming district court's upward sentencing departure based on its recognition that "the existence and enforcement of strict local gun laws in a particular jurisdiction is likely to make the cost of getting a gun in that jurisdiction higher than in a jurisdiction with lax anti-gun laws" and "will increase the profits to be had from trafficking guns into the strong-enforcement jurisdiction."). Indeed, in United States v. Lucania, 379 F. Supp. 2d 288 (E.D.N.Y. 2005), United States District Judge Charles P. Sifton imposed an above-Guidelines sentence for an individual who was convicted of conspiring to deal in firearms, in violation of 18 U.S.C. § 922(a)(1)(A) & (a)(5). In doing so, he (rightly) observed that "[f]irearms smuggled into New

10

York City commonly end up in the hands of those who could not otherwise legally acquire them, are frequently used for illegitimate purposes, and have the potential to create a substantially greater degree of harm when in an urban environment such as New York City than in the United States generally." [4] Id. at 295. As such, Judge Sifton advanced a deterrence-based rationale for sentencing firearms traffickers in this district:

> Stiffer sentences for gun traffickers who move their wares into large metropolitan areas such as New York City are [ ] supported by the purpose of gun trafficking laws, which is to prevent lax firearm laws in one state from undermining the more restrictive laws of other states. That purpose is not served by imposing sentences without regard for objective circumstances existing in the destination city. In states with strict gun control laws, such as New York, a higher percentage of guns used in crimes arrived from out of state . . . Local regulation renders gun running a more serious problem and creates a larger black market in large metropolitan areas such as New York City than in other places . . . Accordingly, a more severe penalty is necessary to produce adequate deterrence.

379 F.Supp. 2d at 295 (citations omitted).

Judge Sifton's rationale—that the circumstances before him presented "a greater-than-average need . . . to achieve strong deterrence"—was affirmed by the Second Circuit, which elected to hear Lucania's appeal en banc. See Cavera, 550 F.3d at 186 (noting that an en banc opinion provided "the opportunity to speak somewhat more broadly, for the purpose of giving guidance to district courts in this Circuit . . . than we normally do as individual panels.").

The government acknowledges that Wolfolk stands convicted of being a felon in possession, not of firearms trafficking, and that many of the trafficked firearms recovered by law enforcement in this case were found on Long Island, not its more densely populated neighboring boroughs. As such, the analogy to Lucania is not perfect and the government is not advocating for an above-Guidelines sentence. There is, however, ample proof that Wolfolk was engaged in firearms trafficking, which constitutes relevant conduct under the Guidelines. And at least one of the firearms purchased by Polidore was recovered by police in Brooklyn while more than a dozen others remain unaccounted for. As such, the Court can and should consider the need for its sentence to "deter the public at large from following in [Wolfolk's] footsteps." Lucania, 379 F. Supp. 2d at 293.

---

[4] Judge Sifton observed that this reality is not adequately captured in the gun-trafficking Guidelines, which "represent a national 'average' that does not reflect objective variations in the increased risk of death or injury that the offense creates in different parts of the country." Lucania, 379 F. Supp. 2d at 296. Therefore, he reasoned, "[b]ecause the Sentencing Guidelines for firearms offenses neglect this critical factor bearing directly on the greater need to deter this sort of offense in this district, they are less persuasive than they would otherwise be in determining an appropriate sentence." Id.

2. Specific Deterrence

Second, Wolfolk's extensive criminal history, which involves prior instances of firearm-related offenses, speaks to the need for the Court's sentence to achieve specific deterrence. For example, on August 12, 2011, at age 18, Wolfolk was one of three individuals who participated in an evidently unprovoked assault on a cab driver. (PSR ¶ 23.) As explained in the PSR, after being driven to a McDonald's restaurant in Uniondale, Wolfolk punched the cab driver in the face, causing the driver to suffer a laceration that required three stitches to close. (Id.) He was convicted of third-degree assault with intent to cause a physical injury, a class A misdemeanor, and sentenced to three years of probation. (Id.)

On April 26, 2023, at age 19, while still on probation, Wolfolk was arrested in possession of a stolen firearm, which he fired during a physical altercation with two men in Hempstead. (PSR ¶ 24.) He was convicted of attempted second-degree criminal possession of a weapon, a class D felony, and sentenced to 42 months' imprisonment. (Id.) His adjustment to supervision was marred by repeated violations of his parole, which was ultimately revoked on January 25, 2018, resulting in Wolfolk's return to prison until May 18, 2018. (Id.) While in custody, Wolfolk incurred nine disciplinary violations for conduct including creating a disturbance, harassment, smoking, disobeying a direct order, intoxication, violent conduct and fighting. (PSR ¶ 24.) And on March 22, 2018, at age 24, he was arrested on an indictment charging him with: (i) second-degree gang assault: cause serious physical injury; (ii) second-degree assault: intent to cause physical injury with weapon/instrument; and (iii) fourth-degree criminal possession of a weapon: firearm/weapon. (Id. ¶ 25.) Although the PSR notes that documentation of the underlying conduct was not available, arrest records obtained by the government reflect that approximately 13 to 20 individuals, including Wolfolk, assaulted a single victim, causing a laceration to the victim's left hand, contusions to his face, and lacerations to the back and side of his head. While not specifically mentioned in the arrest report, it is notable that one of the counts related to the possession of a dangerous weapon during this assault. On January 29, 2019, Wolfolk was convicted of third-degree assault with intent to cause physical injury, a class A misdemeanor. (Id.)

As noted above, on December 4, 2020, at age 27, Wolfolk was arrested with Polidore in Marietta, Georgia, and charged with an assortment of crimes relating to alleged car theft, marijuana possession, and firearm possession. (PSR ¶ 30.) While those charges were pending, on August 26, 2022, Wolfolk was again arrested by officers from the Powder Springs Police Department in Powder Springs, Georgia, who encountered Wolfolk and a minor female (17 years old) partially clothed inside a vehicle in Silver Comet Linear Park after the park had closed. (Id. ¶ 31.) According to police records, the arresting officer detected the odor of marijuana emitting from the vehicle. (Id.) When asked for identification, Wolfolk provided the officer with a credit card bearing his true name and date of birth. (Id.) A search of law enforcement databases revealed outstanding felony warrants for Wolfolk arising from firearm and drug offenses in Cobb County and Douglas County, Georgia. (Id.) Incident to his arrest on those warrants, officers searching Wolfolk's vehicle discovered a firearm hidden in a child's car seat, as well as approximately 8.7 grams of marijuana and two grams of a substance that field tested positive for the presence of MDMA. (Id.) In post-arrest statements to a Powder Springs Police Officer, Wolfolk stated, in substance and in part, that the marijuana belonged to him and that, although the firearm belonged to another person, he (Wolfolk) carried it outside of his home. (Id.) In

12

connection with this incident, Wolfolk was charged with criminal possession of a controlled substance and a firearm, among other offenses. (Id.) Those charges remain pending.

Based on the foregoing, it clear that a considerable custodial sentence is needed to achieve specific deterrence in this case. The conduct forming the instant conviction represents at least the third time Wolfolk has been arrested for violence and/or firearm-related offenses. Indeed, the 42-month sentence he received for criminally possessing a firearm did nothing to deter him from criminality—his post-release conduct escalated to the gun-trafficking conspiracy at the heart of this case. And even after being arrested with his coconspirator in possession of multiple firearms, within 18 months Wolfolk was yet again arrested in a vehicle with drugs and a firearm hidden in a child's car seat. Under these circumstances, Wolfolk's demonstrated proclivity toward reoffending justifies a Guidelines sentence.

IV. Conclusion

Based on the foregoing, the government respectfully submits that a Guidelines sentence is reasonable and appropriate in this case.

Respectfully submitted,

BREON PEACE
United States Attorney

By:  /s/ Anthony Bagnuola
Anthony Bagnuola
Assistant U.S. Attorney
(631) 715-7849

cc: Clerk of the Court (JMA) (via ECF and e-mail)
Glenn Obedin, Esq. (via ECF and e-mail)
Gregory Giblin, U.S. Probation Officer (via ECF and e-Mail)